IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **RANDALL ROBINSON** | * | |
| 7420 Tanyard Knoll Lane | | |
| Glen Burnie, MD  21060 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | Civil Action No.: 1:22-cv-02731-JMC |
| | | |
| **WELLS FARGO BANK, N.A.** | * | **Jury Trial Requested** |
| 171 Jennifer Road | | |
| Annapolis, MD  21401 | * | |
| | | |
| 420 Montgomery Street | * | |
| San Francisco, CA  94104 | | |
| | * | |
| Defendant. | | |
| | * | |
| Serve On: | | |
| Jill Davis, Esq. | * | |
| Wells Fargo | | |
| 90 South Seventh Street | * | |
| Mac N9305-09r | | |
| Minneapolis, MN  55402 | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**FIRST-AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL**

NOW COMES Plaintiff, Randall Robinson ("Plaintiff" or "Robinson"), by and through his

counsel, Michael E. Glass, MBA, Esq. and The Michael Glass Law Firm and, brings suit seeking

redress for unlawful employment practices, as described *infra*, perpetrated by Defendant, Wells

Fargo Bank, N.A. (herein "WF"), for race-based discrimination in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. Sections 2000e *et seq*., and Section

1981 of the Civil Rights Act of 1866 ("Section 1981"), as amended, 42 U.S.C. § 1981,  and in

support states:

## INTRODUCTION

1) The initially-filed complaint is incorporated as if fully set forth herein such that this Amended Complaint related back to the initially-filed complaint.

2) This is a civil action seeking compensatory and punitive damages and injunctive relief against WF to redress its actions for race-based discrimination and retaliation against the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq*. and deprivations of Plaintiff's rights.

## JURISDICTION AND VENUE

3)      The jurisdiction of this court is invoked pursuant to 28 U.S.C. Sections 1331, 1343, and 42 U.S.C. Section 2000e-5(f).  Venue is established in this Court pursuant to 28 U.S.C. Section 1391 and 42 U.S.C. Section 2000e-5(f). The jurisdiction of this court is also invoked pursuant to 28 U.S.C. §1343(3) and 1343(4) conferring original jurisdiction upon this court of any civil action to recover damages or to secure equitable relief under 42 U.S.C. §1981.

4)      Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e -5 (f) and 28 U.S.C. § § 1391(b), since the unlawful employment practice was committed in this district, because the Defendant resides in this judicial district, and a substantial part of the events giving rise to this case occurred in this judicial district.

5)      The amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6)      Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission on or around May 18, 2020 (**Exhibit 1**).

7)      The Plaintiff received a Right-to-Sue Letter by and through his undersigned counsel by email on July 26, 2022  from Damon A. Johnson, State, Local and Tribal Program Manager of the U.S. EEOC, Philadelphia District Office.[1]  (**Exhibit 2**).

8)      The Plaintiff has bought suit within 90 days from the date in which he (through counsel) received the Right-to-Sue Letter.

## PARTIES

9)      The Plaintiff, Randall Robinson, is a resident of the State of Maryland who resides in Anne Arundel County.

10)        The Defendant, WF is a publicly held company that employs over 500 people and has a banking branches throughout the State of Maryland.

## FACTS COMMON TO ALL COUNTS

11)      Robinson began his employment with Defendant on or around June 20, 2007.

12)      Robinson is African American and a member of a protected class.

13)      Robinson's most recent position at the time of his termination was as Branch Manager of the Annapolis branch located at 171 Jennifer Road in Annapolis, MD. Robinson was qualified for the position as a Branch Manager, and also had applied and

---

[1] Mr. Johnson's email indicates that the Right to Sue Letter was emailed to Plaintiff, however, Plaintiff has never received the Right To Sue Letter.  (Mr. Johnson's email also indicates he never received undersigned counsel's letter postmarked and sent on May 25, 2022, a copy of the signed letter and postmarked envelope undersigned counsel retained.)

was qualified for the position of District Manager (DM) and had worked for Defendant WF for over 12 years at the time he was illegally fired.

14)     Robinson began his career at WF as a Licensed Financial Specialist and was continually promoted (Personal Banker 2, Branch Manager I, II) to his then current position of Branch Manager III of one of the largest branches in Maryland.

15)     Robinson's job performance was stellar, and he consistently got exemplary performance reviews.

16)     Because of his exemplary performance and leadership skills, Robinson was encouraged to apply for various senior leadership positions, including District Manager, Retail Sales/Service Consultant, and Affluent Sales Leader among other positions.

WF, however, had a pattern and practice of hiring Caucasian men and women to positions of senior management over competent and qualified African American employees. Indeed, on at least four separate occasions, Robinson was passed over for a Management job, and the job was awarded to a white male counterpart that did not have the level of experience or qualifications as Robinson.

17)     When Robinson was in the process of applying for District Manager positions, there were six existing District Manager positions, only one of which was held by a non-Caucasian.

18)     In February 2019, a District Manager position opened up that Ray Schreiner was applying for (in North Central), and for which Plaintiff applied. During the hiring process, Plaintiff was informed by his direct manager, Schreiner, that that the position was already

earmarked for him (Schreiner) and the position, indeed, ended up being awarded to Schreiner.

19)	When Schreiner was hired to be the North Central DM, Plaintiff was initially encouraged by Schreiner and Patty Tuttle (Schreiner's manager) to apply for the South-Central DM position that Schreiner had just vacated.

20)	Leaders at WF, however, subsequently instructed Plaintiff not to apply for the newly vacated South Central DM position that Ray Schreiner was leaving, because that position was going to be awarded to Margaret Griffith, a Caucasian female.  Plaintiff was further advised that if he did not pursue the South-Central DM position, Plaintiff would be promised the District Manager position in Prince George's County, which was opening up soon.

21)	Plaintiff, indeed, was already actively managing the Prince George's County District.  In reliance on WF's promise that he would be promoted to the Prince George's County DM position if he did not apply to the South Central DM position, Plaintiff did not apply to the South Central DM position which was, indeed, awarded to Margaret Griffith.  As is discussed more fully, *infra*, Plaintiff was not awarded the South Central DM position either.

22)	All performance indicators demonstrated that Plaintiff was highly competent and performing exceptionally well, and multiple WF employees who had less education, experience, or performance received roles that Plaintiff applied for and for which Plaintiff was qualified but did not receive.  All of the successful applicants were white men. By way of example:

i)      In 2014, Marc Watchinski, a Branch Manager 1, was promoted to Retail Sales/Service Consultant, even though Plaintiff was a higher level, higher performing Branch Manager 2 at the time with more years in banking and management;

ii)     In 2016, Josh Simmons, a Branch Manager 1, was promoted to District Manager over Plaintiff, even though Plaintiff was a higher level, higher performing Branch Manager 3 at the time with more years in banking and management. Mr. Simmons also does not have a college degree, whereas Plaintiff does.

iii)    In 2017, Marc Watchinski took a lateral move instead of Plaintiff getting promoted to Affluent Sales Leader.

iv)     In 2018, Kevin Webb, a Branch Manager 3, was promoted to Retail Sales/Service Consultant over Plaintiff, who was a higher performing Branch Manager 3 at the time with more years in banking and management, with a college degree when Webb did not have a degree.

v)      Notably, in contrast to Ray Schreiner who did not have a college degree or Financial licenses, Plaintiff had a college degree as well as several financial licenses including, but not limited to Series 6, Series 63, and Life, Health and Variable Annuity Licenses.[2]

---

[2] Plaintiff earned but did not keep those licenses active.

23)    Around November 2018, a black female Branch Manager.  Theodora Agee, was

fired for an ethical violation for giving a subordinate unauthorized paid time off as a

reward for getting the most referrals.

24)    Around late January to February 2019, Plaintiff discovered that a Service Manager

teller under his management, Elizabeth Getz, was committing the same ethical violation.

Plaintiff brought it up to his District Manager, Raymond Schreiner, a white Caucasian

male, who advised him that he "was too close to a promotion, and not to bring it up."

25)    Plaintiff told Schreiner that he was going to anonymously report Getz and advise

that an African American employee had been terminated for engaging in the exact same

conduct as Elizabeth Getz.  Plaintiff reported the unethical conduct to Human Resources,

and then reported it on the corporate Anonymous Line, and advised Schreiner that he had

done so.

26)    By pointing out that WF was treating a Caucasian employee –who had engaged in

conduct for which an African American employee was terminated—more favorably that

her African American counterpart, and that such disparate treatment was racially

discriminatory, Plaintiff was engaging in protected activity by reporting the

discrimination. And, indeed, the white Service Manager unlike the African American

Branch Manager a few months prior, was not fired, and did she receive any disciplinary

action.

27)    Ray Schreiner was good friends and had a lot of influence with Patty Tuttle, one of

the members of the panel that decided not to award Plaintiff the Prince George's County

DM position, despite promises that he would be awarded that position if he did not apply

to and compete with Margaret Griffith for the South Central DM position.   Upon information and belief, Schreiner told Tuttle that Plaintiff had reported Elizabeth Getz and raised issues of WF's discriminatory practices.

28)     During Plaintiff's application process to the District Manager position, discussed *infra*, Schreiner then told his manager Patty Tuttle that Plaintiff had reported the white Service Manager, which was used against Plaintiff and was a reason Plaintiff did not get the District Manager position and ultimately got fired.  Specifically, Plaintiff suffered an adverse employment action by not being promoted and was retaliated against in direct response for reporting discrimination and engaging in a protected activity.

29)     In 2019, WF engaged Plaintiff to coach and train other branch managers.  WF encouraged Plaintiff to apply for a District Manager job.  Indeed, for several months in 2019, Plaintiff's district was without a District Manager, and Plaintiff did stretch assignments and was the acting District Manager.

30)     Around April 2019, Plaintiff applied for the District Manager position for the Greater Prince George's market in the Maryland region.  Since late October of 2018, Plaintiff had been serving as the interim District Manager for that same market. This was at the request of Plaintiff's Regional President, Patty Tuttle. Plaintiff was thrilled to accept the position and had been promised the position on a permanent basis in exchange for not applying for and competing with Margaret Griffin for the South Central DM position.  In this role, Plaintiff did not receive any pay increase and was working 60-80 hours a week managing both the Jennifer Road branch and taking on the additional role of serving as the active District Manager.

31)     As part of Plaintiff development over his tenure as a Branch Manager, Plaintiff's District Manager Ray Schreiner placed Plaintiff on multiple stretch assignments to groom him for the promised Prince George's County District Manager role. He was asked to coach peers who were struggling, onboard new platform team members and managers, co-facilitate portions of Branch Manager meetings, and lead a specific market segment for the South-Central market.

32)     Plaintiff's performance with these activities afforded him the autonomy to lead as a peer coach and influencer, and Plaintiff's District Manager supported him in spending a lot of time outside of the branch to make progress in these areas. As such, Plaintiff was the only Branch Manager with the track record to support moving him to take on the stretch assignment of managing the nine branches of the Greater Prince George's market, arguably Maryland's most challenging market, along with his own.

33)     The District Manager at that time, Linda Walton, had been on leave for months, and there was only so much that the Regional President and other District Managers could do to keep things moving in the right direction.

34)     All of Plaintiff's coaching and reviews were exemplary and showed that Plaintiff had done excellent work as the acting DM.

35)     Just prior to Plaintiff's application for the District Manager position, Raymond Schreiner made racially discriminatory statements such as that Plaintiff would be promoted because "You're the safe black guy."  Plaintiff's wife and others witnessed this statement.  Schreiner also made statements such as that Plaintiff would be one of the first African Americans promoted to Branch Manager since he "speaks English properly,"

"you don't use vernacular," and that" you know how most black people are; you're not that way."[3]

36)     Schreiner's discriminatory words exemplify WF's underlying racial animus against and in not promoting African Americans to management positions including DM positions.  At the time Plaintiff was not promoted as is explained more fully, *infra,* five of the six WF DMs in Maryland were Caucasian, and one was Latino.

37)     In early March 2019, the Prince George's DM position became available, and Robinson applied, interviewed, and was moved forward in the process.

38)     He was told on or around April 3, 2019, however, that he was not selected to move forward and offered the position, even though Patty Tuttle, the area president, had advised him that he was the high scorer in the interviewing process and informally had congratulated him on getting the position.  Less than two months prior, Plaintiff had reported the disparate and discriminatory treatment of Theodora Agee, an African American female, who was fired for doing the same thing as Elizabeth Getz, a Caucasian female, who was not only <u>not</u> fired, but was not disciplined at all.

39)     No reasons were given, but Plaintiff's Regional President, Patty Tuttle explained that it allegedly had something to do with Plaintiff's coaching or communication style,

---

[3] Amazingly, rather than acknowledging that Schreiner's words –describing Plaintiff as the "safe black guy" who "speaks English property" and is not like "most black people"—are vulgar and *per se* discriminatory and evidence WF's racial animus against African Americans, in its Motion to Dismiss ("MTD") Plaintiff's Complaint, WF adopts the position that "they are no evidence of discrimination because they do not show derogatory animus towards Plaintiff because of his race – rather they show that Schreiner favored Plaintiff for the promotion."  See zmtd at p. 11, fn 5.  (Docket #20-1.)  Essentially, WF argues that Schreiner favored Plaintiff because he presents not as "most black people," but as white.  WF's argument is perhaps more offensive than the words that Schreiner spoke.  To the extent that Schreiner advocated for Plaintiff, which Plaintiff adamantly disputes, Schreiner's characterization of Plaintiff and why he could be promoted at WF since he presents as the "safe black guy" is clear indicia of WF's discriminatory bias and animus against promoting African Americans.

but she was not sure.  The real reason Plaintiff was not promoted, however, was in retaliation engaging in protected activity, specifically for reporting that Theodora Agee had been discriminated against.  Indeed, WF did exactly what Ray Schreiner had warned against when he advised Plaintiff not to report the disparate treatment of Agee in comparison to Getz and specifically stated that Plaintiff "was too close to a promotion, and not to bring it up."

40)     Tuttle further stated that a representative from Employee Relations (ERC)  would be reaching out to Plaintiff to go over the specifics at a later date, but going forward, Plaintiff would be expected to return to the branch and conduct his normal job functions.

41)     That same day, Plaintiff contacted ERC stating that he needed urgent assistance and clarification on what exactly was the issue that prevented him from getting the position since the inference was that his communication and/or management style was flawed, and he was to return to his Branch Manager position, which was still a leadership and management position.  Additionally, up to that point, Plaintiff had never been formally coached on any of these issues, nor had Plaintiff in any way been criticized regarding his management style or technique.

42)     On or around April 5, 2019, Robinson received a call from Ellen Marriott, a Caucasian female, who introduced herself as the Senior ERC Manager for the specific division that handled the screening process for District Manager and above job positions. She stated that the screening process that Plaintiff went through was allegedly a new process that is very extensive. She went on to explain that there are 2 levels of screening (prior to the interview, and post-interview) and that her team looked at a variety of factors

over many years of service such as (but not limited to) leadership style, historical sales practice record, and team members who have been terminated or put on corrective action under Plaintiff's leadership.  Prior to this phone call, Plaintiff had never received any negative feedback on his management style or performance, only the warning from Schreiner not to report the discriminatory treatment of Agee because it would adversely impact his chances at promotion to the DM position.

43)     Yet, suddenly, according to Mrs. Marriott, there allegedly was an ERC case that was placed in late September/October 2018, that had never been brought to Plaintiff's attention, on which Plaintiff had never been counseled, but that raised and suddenly took issue with Plaintiff's coaching style. And, based on that case (and that case alone) there suddenly appeared and was allegedly an issue where, as a consequence, WF decided not to move Plaintiff forward.  From that case, suddenly Plaintiff was found –for the very first time-- to have challenges with his ability to communicate with his team.  Notably, Plaintiff reported the discrimination and made Schreiner aware of his reporting it after the bogus ERC case that allegedly had occurred six months prior to his engaging in protected activity and that had never been brought to Plaintiff's attention until after engaging in protected activity.

44)     The case from late September/October 2018 involved a team member –a teller— that did not report directly to Plaintiff, but complained that Plaintiff was absent from the branch and did not advise the team why he was absent.  Of course, during this time, Plaintiff had been charged by his District Manager to act as a District Manager which necessitated time away from the branch.  Yet, that Plaintiff was away from the branch –

when he was engaged to do a job that required it—was now being cited as a flaw in his management style.  Indeed, at all times that Plaintiff was absent from the branch, he let the most senior person at the branch know where he was, what he was doing, and how to get in touch with him.  And, until he applied for the District Manager position more than six months later, Plaintiff had never been advised or counseled that there were any issues with his management style or practice.

45)    The ERC representative further alleged that Plaintiff had inappropriately counseled people in public, yet until Plaintiff had applied for the District Manager position, Plaintiff had never been alerted or counseled that there were any flaws with his management style or that he needed improvement in any areas whatsoever.  Indeed, the reasons given by WF for not promoting Plaintiff as described herein were fabricated, bogus and a pretext for not promoting him, the real reason for which was because he is an African American and in retaliation for his engaging in protected activity in reporting the racial discrimination against Theodora Agee which occurred six months after the alleged October 2018 ERC case.

46)    No examples of inappropriate counseling were given to Plaintiff, nor did Marriott discuss or differentiate instances when Plaintiff should coach an employee in public, such as when an employee was having a problem handling a customer issue and needed immediate assistance in the moment.

47)    Plaintiff was not afforded the opportunity to even respond to the criticisms Marriott was raising for the very first time, nor was he in any way counseled on how he should

improve.  Rather, Marriott said the decision not to move him forward was final without providing Plaintiff an opportunity to respond.

48)     Marriott's suggestion on improvement was simply "to do a better job of communicating" and "not to coach others in public" without being specific and without addressing certain instances that warranted coaching in public, such as assisting an employee in the moment on how to handle a customer issue that the employee did not know how to do.

49)     Plaintiff assured Marriott that any counseling or coaching of a sensitive nature always took place in private, yet Marriott would not listen.

50)     Plaintiff explained how he alerted senior employees to his whereabouts and what he was doing when he was out of the branch and invited Marriott to review the emails and other correspondence that provided confirmation, but Marriott would not listen or agree to review the documentation.

51)     Marriott did not explain why she took the word of the branch employee, Kimberly Lind, a white female, and never bothered to interview Plaintiff as part of her investigation.

52)     By the time Plaintiff was contacted by Marriott, he had been performing the District Manager job for five months as a stretch assignment.   Significantly, Plaintiff's performance as the District Manager was not formally reviewed; rather, his lack of presence at his branch, even though he was required to be away from the branch—was used as a pretext to deny him the promotion to District Manager.  What is patently clear is that Plaintiff was not promoted in retaliation for reporting the race discrimination and disparate treatment involving Agee and Getz and that he is African American, and that

Plaintiff's flawed management style was nothing but a pretext, ruse, and contrived and fabricated reason for not promoting him. Furthermore, the exact repercussions that Schreiner had warned about if Plaintiff reported discrimination came to fruition.

53)     Indeed, Plaintiff's District Manager gave him the autonomy to run the District and, even though he was performing as the District Manager, Plaintiff ran double duty and made sure that his branch was properly running.

54)     During Plaintiff's entire 5-month tenure as the acting District Manager, he received nothing but accolades and praise. And, during the entire time Plaintiff worked with his District Manager, Plaintiff was never placed on corrective action or had any documented coaching.

55)     As a manager, Plaintiff was never placed on performance coaching or corrective action. Despite that Plaintiff was expected to return to work as a Branch Manager which, in and of itself, is a management position. And, even though Plaintiff, for the first time, was being criticized, he still was not counseled on how to improve.

56)     Indeed, if the findings against Plaintiff's management style were actually negative and not a pretext to deny him the District Manager position begs the question why Plaintiff was being returned to a management position without coaching and the performance of which was now being criticized.

57)     Plaintiff requested guidance on how he could improve, but neither Marriott or anyone else from WF responded, and Plaintiff returned to his Branch Manager position.

58)     The DM position was filled by a Hispanic female despite that Plaintiff was eminently qualified for the job and had been promised the promotion in exchange for not competing with Griffith for the South Central DM position.

59)     About a week after Plaintiff's phone call with Ellen Marriott, Plaintiff requested to meet, and did meet with, a Human Resources representative.

60)     In that meeting, Plaintiff expressed that he believed that he was being discriminated against based on his race and, specifically, that he had not been promoted based on his race and for engaging in protected activity by reporting WF's discriminatory firing of Theodora Agee.

61)     After Plaintiff returned to his branch manager position, from April 5, 2019 until November 18, 2019, he continued to raise concerns of WF's discriminatory practices with Schreiner, Griffith, Tuttle, and others, including that he was being discriminated against and not promoted based on his race and treated disparately (including that five out of the six DMs in the State were Caucasian, with one Latino), that Agee had been discriminated against based on her race, and that he was being retaliated against for reporting the Agee discrimination.

62)     Plaintiff further voiced his concern that he would be further retaliated against for reporting WF's discriminatory practices, and was advised to contact a third-party investigation company, which he did.

63)     In addition to speaking with the third-party investigation company, from April 6, 2019 until November 18, 2019 Plaintiff advised Ray Schreiner, his immediate manager,

Margaret Griffith, Patty Tuttle, and Tim Wilburn, Regional Service Consultant, of his concerns of discriminatory practices and that he was being retaliated against.

64)     On or around November 18, 2019, Plaintiff received a call from Margaret Griffith advising him that he was being placed on administrative leave.  Plaintiff was not given the reason for being placed on leave.

65)     On or around November 23, 2019, Plaintiff received a call from an investigator from Human Resources, Pete Luedemann, a Caucasian male, but Plaintiff was not told why he was being investigated.  Luedemann began asking him whether he had ever been aggressive to any employee, whether he had ever put his hands on an employee, and other questions along similar lines.  During that conversation, Plaintiff advised Luedemann that he had reported discrimination against Theodora Agee two months prior to his not being promoted, and that he believed that he was being retaliated against for reporting the discrimination and was being discriminated against based on his race.  He explained to Luedemann that he had been the acting DM for Prince George's County and had received praise and accolades for his performance, that he had been promised the DM position in exchange for not applying for the South Central DM position, and that he believed that he was being discriminated against based on his race, African American, since six of the seven DMs in the State were Caucasian, and one DM was Latino.  As is discussed more fully, *infra*, after raising his concerns with Luedemann, less than six weeks later Plaintiff was fired.

17

66)     Ultimately, Plaintiff was advised that an employee under his management at the Jennifer Road Branch had accused Plaintiff of pushing him.  The allegations were totally false and Plaintiff had no idea what the allegations pertained to or who the employee could be who had made the accusations.

67)     Plaintiff had never been counseled or even advised of any such allegation.

68)     Plaintiff was advised that he had violated the WF antiharassment policy, even though he was never written up for it.

69)     Plaintiff was on administrative leave from November 18 until December 30, 2019, when he was called again by Margaret Griffith and advised that he was being terminated for cause.  The termination occurred less than six weeks after Plaintiff raised concerns with Luedemann about WF's discriminatory practices and that Plaintiff believed that he was being discriminated against based on his race, and was being retaliated against for voicing concerns of discrimination against himself and Theodora Agee.  Griffith was seemingly sad about Plaintiff being terminated, but was not able to provide any information or reasons for the termination.

70)     In violation of the WF Personnel Handbook, Plaintiff was never given the opportunity to meet with WF management to discuss or in any way challenge the findings. Indeed, Plaintiff was not given the opportunity to participate in the investigation whatsoever.

71)     All of the investigators and decision makers in Plaintiff's termination were Caucasian.

72)     The allegations of Plaintiff's alleged pushing of a subordinate were untrue, unsubstantiated, and were used as a pretext to fire Plaintiff.

73)     The allegations against Plaintiff of violating the antiharassment policy were pretextual and used as a reason and excuse to fire Plaintiff, even though the allegations were unsubstantiated and untrue.

74)     Plaintiff was retaliated against for engaging in protected activity and reporting Elizabeth Getz for engaging in unethical practices, and then subsequently reporting and complaining to HR that it was discriminatory for the African American Branch Manager, Theodora Agee, for getting fired when Getz –who did the exact same thing a few months later—did not.

75)     Plaintiff was retaliated against for engaging in protected activity when he met with HR personnel after he was not promoted to the Prince George's County District Manager position and voiced his concerns that he was amply qualified for the position and, indeed, had been working as the acting District Manager with stellar reviews, and was denied the position for discriminatory reasons based on his race and in retaliation for reporting WF's discriminatory actions against Agee and against himself by not being promoted.

76)     In fact, after Plaintiff raised concerns of race discrimination, he was placed on administrative leave, and then fired after speaking with Pete Luedemann, Schreiner, Tuttle and Griffith after the retaliation and discrimination to which he had been subjected, without being given a chance to address the baseless and fabricated allegations that WF used as the underlying reasons for his termination.

77)     The vast majority of senior managers at WF are white males.

78)     All the managers and decision makers who decided not to promote Plaintiff and

ultimately to fire Plaintiff, are white.

79)     Plaintiff was treated disparately when employees who not African American,

including for the Prince George's County DM position, were promoted over Plaintiff, even

though they did not have the level of education, experience, or qualifications as Plaintiff.

80)     Plaintiff had no prior disciplinary issues.[4]

81)     The disparate and racist treatment of Plaintiff by Defendant is illegal and violates

Title VII and section 1981.

## COUNT I: VIOLATION OF TITLE VII
### (Race-Based Discrimination – Illegal Failure to Promote, Illegal Termination)

82)     Plaintiff re-alleges and incorporates by reference the previous averments, and the

paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that

at all times relevant hereto Plaintiff suffered disparate treatment because of his race in

violation of Title VII.

83)     Plaintiff is a member of a protected group, African American.

84)     Plaintiff applied for three DM positions, the last of which was the Prince George's

County DM position.

85)     Plaintiff was eminently qualified for the DM position and, indeed, had been

performing it for five months through stretch assignments.  Plaintiff's job performance as

Branch Manager and then as DM was more than satisfactory.  Indeed, he had stellar

---

[4] The only issue Plaintiff had in his over 12 year career at WF was that in April 2019 he inadvertently left a drawer
unlocked, that did not result in any loss or negative consequence.

reviews and accolades in both positions and was promised the Prince George's County DM position.

86)    The Defendant rejected Plaintiff's application under circumstances that give rise to an inference of discrimination since there was no legitimate reason to deny Plaintiff's application.  Indeed, Plaintiff's qualifications, education, licenses that he had obtained in the financial industry, management experience, and years worked at WF exceeded his Caucasian counterparts and his job performance both as Branch Manager and then as acting DM exceeded satisfactory.

87)    The Defendant and its employees and representatives intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting racial discrimination in employment, directly discriminated against Plaintiff, and treated him less favorably than Raymond Shreiner and other white employees (that represent the majority of senior managers by an overwhelming margin at WF) in comparable positions and/or subject to the same company rules regarding discipline for comparable alleged infractions.

88)    The action of Defendant to not promote him to District Manager and ultimately to fire him in this matter was motivated by race-based disfavor and animus against Plaintiff as an African American.

89)    The actions of Defendant to deprive him of his job while awarding the job to a non-African American less educated, less experienced, and less qualified counterpart was motivated by race-based disfavor and animus against Plaintiff as an African American. Plaintiff suffered an adverse employment action by being not promoted, being placed on unpaid leave, and then being terminated.

90)     The race-based discriminatory action detrimentally affected Plaintiff in that he was not promoted and was ultimately fired and would detrimentally affect a reasonable person of the same race and/or gender in that position.

91)     The race-based discriminatory action suffered by Plaintiff affected the terms, conditions, and privileges of his employment since he was illegally passed over for promotion and fired and lost his job.

92)     Defendants had actual and/or constructive knowledge about the racial discrimination and disparate treatment (including that Plaintiff reported that his non-promotion was racially motivated) and not only failed to take prompt and adequate remedial action, but instead, participated in the racial discriminatory conduct and disparate treatment of Plaintiff.

93)     As a direct and proximate result of this racial discrimination and disparate treatment, Plaintiff has suffered injury to his reputation and career, pain, mental anguish, and humiliation; economic and noneconomic losses, and, faces irreparable harm and future losses.

## COUNT II: VIOLATION OF TITLE VII
### (Retaliation)

94)     Plaintiff re-alleges and incorporates by reference the paragraphs, *supra*, and the paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that at all times relevant hereto Plaintiff suffered disparate treatment because of his race as an African American and retaliation for engaging in protected activity, in violation of Title VII.

95)     Plaintiff engaged in protected activity by reported instances of disparate treatment
and racism including reporting the disparate treatment of Elizabeth Getz and Theodora
Agee, described, *supra*, as well as complaining about racial discrimination and disparate
treatment regarding WF's unsubstantiated failure to promote Plaintiff to the District
Manager position, placing him on unpaid leave, and then firing him.

96)     After Plaintiff lodged complaints regarding the disparate treatment of Getz and
Agee less than six weeks later, Plaintiff was wrongfully not promoted to the DM position.
The failure to promote Plaintiff is tantamount to an adverse employment action.

97)     There is a causal connection between Plaintiff engaging in protected activity and his
not being promoted.

98)     After Plaintiff was denied the promotion, he engaged in protected activity by
lodging a complaint of discrimination and that he had been wrongfully denied the
promotion based on his race.  From April 6 through November 18, 2019, Plaintiff lodged
complaints described, *supra*, of the discriminatory practices of WF including that he had
been passed over in retaliation for reporting the Agee discrimination.  Shortly after
reporting that he was wrongfully and discriminatorily not promoted from April through
November 2019, Plaintiff was placed on unpaid leave and then terminated for cause for
allegedly for pushing a subordinate employee, which was a fabricated, untrue allegation
used as a pretext to fire Plaintiff.

99)     The allegations against Plaintiff --that he had pushed a subordinate employee-- were
completely bogus and fabricated, and used as a pretext to fire Plaintiff, when the real

reason Plaintiff was fired was due to racial animus and in retaliation for Plaintiff engaging in protected activity.

100)   At all times relevant to this lawsuit, Plaintiff was an "employee" and Defendant WF was an "employer" as those terms are defined by Title VII.

101)   Plaintiff was wrongly denied promotion and wrongly placed on unpaid leave and then terminated with a resultant loss of pay and other benefits and opportunities for which he would have otherwise been eligible.  The decision to not promote Plaintiff and ultimately to fire him was a pretext for race discrimination and an unlawful employment practice in violation of Title VII.

102)   The wrongful failure to promote and termination, retaliation and discriminatory treatment caused Plaintiff to sustain and continue to sustain direct and consequential damages, including but not limited to, physical and emotional pain, mental anguish, humiliation and embarrassment, damage to professional reputation and development, economic and noneconomic losses, loss of income and other economic benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

103)   The Defendant and its agents engaged in this outrageous and reckless conduct maliciously or with willful disregard of Plaintiff's safety, health, wellbeing, and rights under Title VII, justifying an award of punitive damages.

104)   The actions complained of herein violated the Plaintiffs right to be free of race discrimination, retaliation, and a hostile work environment under Federal law.

## **<u>COUNT III: IN VIOLATION OF SECTION 1981</u>**

**(Race-Based Discrimination – Illegal Failure to Promote, Illegal Termination)**

105)     Plaintiff re-alleges and incorporates by reference the paragraphs, *supra*, and the paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that at all times relevant hereto Plaintiff suffered disparate treatment, was wrongfully denied a promotion, and was fired because of his race as an African American, in violation of Section 1981.

106)     Plaintiff is a member of a protected group, African American.

107)     Plaintiff applied for three DM positions, the last of which was the Prince George's County DM position.

108)     Plaintiff was eminently qualified for the DM position and, indeed, had been performing it for five months through stretch assignments.  Plaintiff's job performance both as branch manager and acting DM exceeded satisfactory.  Indeed, Plaintiff received stellar reviews and accolades for his performance in both positions.

109)     The allegations against Plaintiff --that he had pushed a subordinate employee-- were completely bogus and fabricated, and used as a pretext to fire Plaintiff, when the real reason Plaintiff was fired was due to racial animus and in retaliation for Plaintiff engaging in protected activity.  The but for reason for WF's failure to promote Plaintiff's was due to his race, African American, and in retaliation for his engaging in protected activity as described, *supra*.

110)     The Defendant rejected Plaintiff's application under circumstances that give rise to an inference of discrimination since there was no legitimate reason to deny Plaintiff's

application.  Indeed, Plaintiff's qualifications, education, licenses that he had obtained in the financial industry, management experience, and years worked at WF exceeded that of his Caucasian counterparts, and his performance as acting DM had been exemplary.

111)    The Defendant intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting racial discrimination in employment, directly discriminated against Plaintiff and treated Plaintiff less favorably than other white employees when Plaintiff was not promoted and then fired after he complained of racism in the application process.

112)    The actions of Defendant in failing to promote him and then firing him were based on racial disfavor and animus against Plaintiff because of his race as an African American and for Plaintiff engaging in protecting activity bringing to light allegations of racial discrimination involving not only him but WF employees.  Specifically, race was the but-for reason for not being promoted to DM and then being fired.

113)    The racial discriminatory action detrimentally affected Plaintiff and would detrimentally affect a reasonable person of the same race in that position.

114)    The race-based discriminatory action suffered by Plaintiff affected the terms, conditions, and privileges of Plaintiff's employment with WF since he was fired.

115)    Defendant had actual and/or constructive knowledge about the race-based discrimination and disparate treatment (including because Plaintiff reported it) and not only failed to take prompt and adequate remedial action, but instead, participated in and encouraged the racial discriminatory conduct and disparate treatment of Plaintiff.

116)     As a direct and proximate result of this racial discrimination and disparate treatment,

Plaintiff has suffered injury to his reputation, pain, mental anguish, and humiliation; lost

wages, economic and noneconomic harm and damages, and, faces irreparable harm and

future losses, as well as economic damages.

## COUNT IV
## RETALIATION IN VIOLATION OF SECTION 1981

117)     Plaintiff re-alleges and incorporates by reference the paragraphs, *supra*, and the

paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that

at all times relevant hereto Plaintiff suffered disparate treatment because of his race as an

African American, in violation of Section 1981 and was retaliated against for engaging in

protected activity as described, *supra*.

118)     Plaintiff engaged in protected activity by reported instances of disparate treatment

and racism including reporting the disparate treatment of Elizabeth Getz and Theodora

Agee, described, *supra*, as well as complaining about racial discrimination and disparate

treatment regarding WF's unsubstantiated failure to promote Plaintiff to the District

Manager position and then placing him on unpaid leave.

119)     After Plaintiff lodged complaints regarding the disparate treatment of Getz and

Agee in February 2019, less than six weeks later on April 6, 2019, Plaintiff was wrongfully

denied promotion to the Prince George's County DM position.  The failure to promote

Plaintiff is tantamount to an adverse employment action.

120)     There is a causal connection between Plaintiff engaging in protected activity and his

not being promoted less than six weeks after reporting the discriminatory acts of WF.

121)     After Plaintiff was denied the promotion, he engaged in protected activity by lodging complaints of discrimination and that he had been wrongfully denied the promotion based on his race.  Shortly thereafter, Plaintiff was placed on unpaid leave. After he complained to Pete Luedemann that he was being discriminated and retaliated against, and that the allegations against Plaintiff were bogus and fabricated, less than seven weeks later he was terminated.  The termination was "for cause" for allegedly for pushing a subordinate employee.

122)     The allegations against Plaintiff --that he had pushed a subordinate employee-- were completely bogus and fabricated, and used as a pretext to fire Plaintiff, when the real reason Plaintiff was fired was due to racial animus and in retaliation for Plaintiff engaging in protected activity.  Specifically, Plaintiff's race, African American, and his engaging in protected activity, were the but for reasons for the failure to promote Plaintiff to the DM position, placing him on unpaid leave, and then terminating him.  Indeed, WF failed to promote Plaintiff after he engaged in protected activity by reporting discrimination and disparate treatment of Theodora Agee exactly as Ray Schreiner had warned would occur if Plaintiff reported the discrimination.

123)     Plaintiff engaged in protected activity by reported instances of disparate treatment and racism including reporting the disparate treatment of Elizabeth Getz and Theodora Agee, described, *supra*, and complaining about racial discrimination against Plaintiff in the application process for and denial of his being awarded the District Manager position.

124)     At all times relevant to this lawsuit, Plaintiff was an "employee" and Defendant WF was an "employer" as those terms are defined by Section 1981.

125)     Plaintiff was wrongly denied promotion and wrongly terminated with a resultant loss of pay and other benefits and opportunities for which he would have otherwise been eligible.  The decision to not promote Plaintiff and ultimately to fire him was a pretext for race discrimination and an unlawful employment practice in violation of Section 1981.

126)     The wrongful failure to promote and termination, retaliation and discriminatory treatment caused Plaintiff to sustain and continue to sustain direct and consequential damages, including but not limited to, physical and emotional pain, mental anguish, humiliation and embarrassment, damage to professional reputation and development, loss of income and other economic benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

127)     The Defendant and its agents engaged in this outrageous and reckless conduct maliciously or with willful disregard of Plaintiff's safety, health, wellbeing, and rights under Section 1981, justifying an award of punitive damages.

128)     The actions complained of herein violated the Plaintiffs right to be free of race discrimination, retaliation, and a hostile work environment under Federal law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this court enter judgment in his favor and grant him the maximum relief allowed by law, including, but not limited to:

(a) back wages, compensation, and payment of benefits that Plaintiff would otherwise be entitled;

(b) reinstatement of his job duties and/or front pay;

€   punitive damages;

(d) compensatory economic and non-economic damages in excess of Seventy-Five Thousand Dollars including compensation for mental pain, suffering, humiliation, and loss of reputation;

€ injunctive relief including purging his employment file of bogus write-ups and charges;

(d) reasonable attorneys' fees, costs, pre- and post-judgment interest; and

€    such other relief as are just and equitable under the circumstances.

Respectfully submitted,

_____
        /s/
Michael E. Glass, MBA, Esq., Trial Bar No. 11805
The Michael Glass Law Firm
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
Phone: (410) 779-0600, Fax: (410) 814-4604
Email: mglass@mglasslaw.com

*Attorneys for Plaintiff Randall Robinson*

## **PRAYER FOR JURY TRIAL**

Plaintiff prays to have this case tried by a jury.

_____
        /s/
Michael E. Glass, MBA, Esq.