IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **RANDALL ROBINSON** | * | |
| 7420 Tanyard Knoll Lane | | |
| Glen Burnie, MD  21060 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | Civil Action No.: 1:22-cv-02731-JMC |
| | | |
| **WELLS FARGO BANK, N.A.** | * | |
| 171 Jennifer Road | | |
| Annapolis, MD  21401 | * | |
| | | |
| 420 Montgomery Street | * | |
| San Francisco, CA  94104 | | |
| | * | |
| Defendant. | | |
| | * | |
| Serve On: | | |
| Jill Davis, Esq. | * | |
| Wells Fargo | | |
| 90 South Seventh Street | * | |
| Mac N9305-09r | | |
| Minneapolis, MN  55402 | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORNDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS[1]**

Plaintiff Randall Robinson ("Mr. Robinson" or "Plaintiff), hereby submits this Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss.

## **INTRODUCTION**

---

[1] Defendant has conceded that Plaintiff pled a *prima facie* case for Retaliatory Discharge under Title VII, and Retaliatory Discharge and Retaliatory Failure to Promote under Section 1981.  Accordingly, Plaintiff does not address these counts in this Opposition.

Plaintiff Randall Robinson brings this employment discrimination lawsuit against his former employer, Wells Fargo.  As alleged, Mr. Robinson was passed over for a promotion for a District Manager position based on his race, African American, in violation of Title VII and Section 1981. He was also retaliated against (by being passed over and ultimately terminated) for engaging in protected activity by reporting racial discrimination that he witnessed against an employee he managed and also in lodging complaints about racial discrimination directed at him by Wells Fargo. Since Plaintiff has pled the *prima facie* elements for race discrimination until Section 1981 and Title VII, Defendant's Motion to Dismiss must be denied.

## STATEMENT OF FACTS

On June 20th, 2007, Mr. Randall Robinson—An African American man, began what would become a twelve- and half-year career with the Defendant, Wells Fargo. ("Am. Compl." or "Amended Complaint") *Am. Compl. ¶ ¶7, 11*. Over the span of that twelve-year career, Mr. Robinson was continuously promoted based on his performance and leadership skills to higher positions, moving from Licensed Financial Specialist to Personal Banker 2, Branch manager I and II, and then finally to Branch Manager III. *Amend. Compl. ¶¶13, 14.* As Branch Manager III of the Annapolis division—Mr. Robinson was responsible for one of the largest branches in Maryland. *Amend. Compl. ¶13.* Because of Robinson's job performance and leadership skills, he was encouraged to apply to various senior leadership positions, including District Manager ("DM"). *Amend. Compl. ¶15.* In fact, Mr. Robinson's performance over the decade is what prompted The Regional President of his division, Patty Tuttle, to assign him the role of 'Interim District Manager' in late October of 2018. *Amend. Compl ¶¶ 26, 27.*

As interim district manager, Mr. Robinson did not receive a pay increase, despite working 60 to 80 hours a week managing both the Annapolis Branch and taking on the additional role of active

District Manager. *Amend. Compl. ¶ 29.* Additionally, to groom Mr. Robinson for the role of District

Manager, Mr. Robinson's direct manager, Ray Schreiner, placed Mr. Robinson on multiple stretch

assignments. *Amend. Compl. ¶ 31.*  Mr. Robinson was asked to coach peers who were struggling,

onboard new platform team members and managers, co-facilitate portions of the Branch Manager

meetings, and lead a specific market segment for the South-Central Market. *Amend. Compl. ¶ 31.*

Mr. Robinson's performance with these activities afforded him the autonomy to lead as a peer coach

and influencer, and Plaintiff's District Manager supported him in spending a lot of time outside of

the branch to make progress in these areas. *Amend. Compl. ¶ 32.*  As such, Plaintiff was the only

Branch Manager with the track record to support moving him to take on the stretch assignment of

managing the nine branches of the Greater Prince George's market, arguably Maryland's most

challenging market, along with his own. *Amend. Compl. ¶ 32.*

Unfortunately for Mr. Robinson, due to Wells Fargo's demonstrated commitment to a pattern

and practice of promoting Caucasian men and women to positions of senior management, over

competent and qualified African American employees, Mr. Robinson was repeatedly passed over for

a management job. *Amend. Compl. ¶15.* In fact, on at least *four* separate occasions, Mr. Robinson

was passed over for a management job, and the position was awarded to a white male counterpart

that did not have the level of experience or qualifications as Robinson. *Amend. Compl. ¶15.*

In February 2019, a District Manager position opened up in the North Central District, which

Mr. Robinson applied for. *Amend. Compl. ¶¶ 17*. When Mr. Robinson was in the process of applying

for this District Manager position, there were six existing DMs and only one was occupied by a non-

Caucasian. *Amend. Compl. ¶¶ 16.* Amid the hiring process, Mr. Robinson was informed by his

Direct Manager, Raymond Schreiner, a white male, that the role was already "ear-marked" for him

(Schreiner), and indeed the position ended up being awarded to Schreiner. *Amend. Compl. 17.*

Despite this, After Schreiner was hired to North Central DM position, in awareness of Mr. Robinson's expressed interest in applying for a managerial role, Mr. Robinson was encouraged by Schreiner himself, and the Regional President—Patty Tuttle, to apply for the South-Central DM position that Schreiner had just vacated. ***Amend. Compl. ¶ 18.***

Subsequently, Mr. Robinson was instructed to not apply for the newly vacated South-Central DM position that Ray Schreiner was leaving, because that position was going to be awarded to Margaret Griffith, a Caucasian female. ***Amend. Compl. 19, 20.*** Indeed, yet another role Mr. Robinson was applying for, had already been "ear-marked" for a Caucasian-female. Mr. Robinson was further advised that if he did not pursue the South-Central Position, he would be awarded the District Manager Position in Prince George's County—the same county he was already actively managing as the interim District Manager. ***Amend. Compl. ¶¶ 19, 20.***

All performance indicators demonstrated that Mr. Robinson was not only highly competent in his roles, but also performing exceptionally well. Multiple Wells Fargo employees who had less education, experience, or performance received roles that Mr. Robinson applied for and did not receive. ***Amend. Compl. ¶21.*** All of the successful applicants were white males, less qualified and competent for the roles applied for. ***Amend. Compl. ¶ 21.***

In 2017, Marc Watchinski took a lateral move instead of Mr. Robinson getting promoted to Affluent Sales Leader. In 2018, Kevin Webb, a Branch Manager 3, was promoted to Retail Sales/Service Consultant over Mr. Robinson, who was a higher performing Branch Manager 3 at the time with more years in banking and management, with a college degree when Webb did not have a degree. ***Amend. Compl. ¶ 21.*** Notably, in contrast to Ray Schreiner who did not have a college degree or Financial licenses, Mr. Robinson had a college degree as well as several financial licenses

including, but not limited to Series 6, Series 63, and Life, Health and Variable Annuity Licenses. ***Amend. Compl. ¶21.***

Around November of 2018, a Black female Branch manager, Theodora Agee, was fired for an ethical violation for giving a subordinate unauthorized paid time off as a reward for getting the most referrals. ***Amend. Compl. ¶22.*** However in early February 2019, Mr. Robinson discovered that a Service Manager Teller under his management, Elizabeth Getz, was committing the same ethical violation. ***Amend. Compl. ¶23***.

Astonishingly, after bringing the issue up with Ray Schreiner, a white Caucasian male and Mr. Robinson's District manager, Mr. Robinson was instructed to "not bring it up" because he "was too close to a promotion". ***Amend. Compl. ¶23.*** Notably, Mr. Robinson ultimately reported the unethical conduct to Human Resources and then to the Corporate Anonymous line and had informed Schreiner that he had done so. ***Amend. Compl. ¶24.*** Unlike Theodora Agee, the White service manager Elizabeth Getz, was not fired for the unethical conduct nor did she receive any disciplinary action. ***Amend. Compl. ¶24.***

By pointing out that WF was treating a Caucasian employee –who had engaged in conduct for which an African American employee was terminated—more favorably that her African American counterpart, and that such disparate treatment was racially discriminatory, Plaintiff was engaging in protected activity by reporting the discrimination. ***Amend. Compl. ¶26.*** Ray Schreiner was good friends and had a lot of influence with Patty Tuttle, one of the members of the panel that decided not to award Plaintiff the Prince George's County DM position, despite promises that he would be awarded that position if he did not apply to and compete with Margaret Griffith for the South-Central DM position. ***Amend. Compl. ¶ 27.***

Upon information and belief, Schreiner told Tuttle that Plaintiff had reported Elizabeth Getz and raised issues of WF's discriminatory practices. ***Amend. Compl. ¶27.*** During Plaintiff's application process to the District Manager position, discussed infra, Schreiner then told his manager Patty Tuttle that Plaintiff had reported the white Service Manager, which was used against Plaintiff and was a reason Plaintiff did not get the District Manager position and ultimately got fired. ***Amend. Compl. ¶28.*** Specifically, Plaintiff suffered an adverse employment action by not being promoted and was retaliated against in direct response for reporting discrimination and engaging in a protected activity. ***Amend. Compl. ¶28.***

Just prior to Mr. Robinson's application for the District Manager position, Raymond Schreiner made racially discriminatory statements such as that Mr. Robinson would be promoted because "You're the safe black guy." Mr. Robinson's wife and others witnessed this statement. Schreiner also made statements such as that Mr. Robinson would be one of the first African Americans promoted to Branch Manager since he "speaks English properly". At the time Mr. Robinson was not promoted, five of the six WF DMs in Maryland were Caucasian, and one was Latino. ***Amend. Compl. ¶36.***

In early March 2019, the Prince George's DM position became available. Robinson, applied, interviewed and was moved forward in the process. ***Amend. Compl. ¶33.*** Despite being the highest scorer in the interview process and receiving an informal congratulations from the Regional President, he was told on or around April 3, 2019 that he was not selected to move forward and offered the position, even though Patty Tuttle, the area president, had advised him that he was the high scorer in the interviewing process and informally had congratulated him on getting the position. Less than two months prior, Mr. Robinson had reported the disparate and discriminatory treatment of Theodora Agee, an African American female, who was fired for doing the same thing as Elizabeth

Getz, a Caucasian female, who was not disciplined at all. *Amend. Compl. ¶38.*. Indeed, Wells Fargo then did exactly what Ray Schreiner had warned against when he advised Mr. Robinson not to report the disparate treatment of Agee in comparison to Getz and specifically stated that Mr. Robinson "was too close to a promotion, and not to bring it up." *Amend. Compl. ¶39.*

On or around April 5, 2019, Mr. Robinson received a call from Ellen Marriott, a Caucasian female and Senior ERC Manager responsible for screening District Manager and above positions. Up until that time, Mr. Robinson had never received any negative feedback about his management style or performance prior to this call, except for Schreiner's warning not to report discriminatory treatment by Agee as it could hinder his chances of promotion to District Manager. *Amend. Compl. ¶42.*

Marriott alleged the existence of an undisclosed ERC case from late September/October 2018 that criticized Mr. Robinson's coaching style. Mr. Robinson had never been made aware of this case or received any counseling related to it. Allegedly, based solely on this case, Wells Fargo (WF) decided not to promote Mr. Robinson, citing challenges in his ability to communicate with his team, which were never previously raised or addressed. Notably, Mr. Robinson reported the discrimination to Schreiner after the alleged ERC case, six months before engaging in protected activity. *Amend. Compl. ¶43.* Until his application for the District Manager position, Mr. Robinson had never been advised or counseled about any issues with his management style or practices. *Amend. Compl. ¶44.*

The ERC representative alleged that Mr. Robinson inappropriately counseled individuals in public, but Mr. Robinson had never been alerted or counseled about such flaws in his management style before applying for the District Manager position. No examples of inappropriate counseling were provided, and Marriott did not discuss or distinguish situations where coaching in public might

be necessary, such as assisting employees with immediate customer issues. ***Amend. Compl. ¶45.***
During Mr. Robinson's five-month tenure as acting District Manager, his performance received
consistent praise, and there were no documented coaching or corrective actions against him. ***Amend.***
***Compl. ¶54.***

Despite not receiving the promotion, Mr. Robinson continued to perform his duties as Branch
Manager. However, he did not receive any counseling or guidance on improvement as promised by
Marriott. ***Amend. Compl. ¶55.*** Mr. Robinson requested guidance on how to improve, but neither
Marriott nor anyone else from WF responded. The District Manager position was ultimately filled by
a Hispanic female, despite Mr. Robinson's ample qualifications and the promise of promotion in
exchange for not competing for the South-Central DM position against Griffith. ***Amend. Compl. ¶58.***
At that time (and up until the present), no DMs were (are) African American.

Approximately one week after Mr. Robinson's call with Marriott, he met with a Human
Resources representative to express his belief that he faced racial discrimination and had been denied
promotion based on race and retaliation for reporting Agee's discriminatory termination. ***Amend.***
***Compl. ¶¶59, 60.***

From April 6, 2019, until November 18, 2019, Mr. Robinson continued raising concerns
about WF's discriminatory practices, discrimination against Agee, disparate treatment based on race,
and retaliation for reporting discrimination. He raised these concerns with Schreiner, Griffith, Tuttle,
Tim Wilburn (Regional Service Consultant), a third-party investigation company, and others.
***Amend. Compl. ¶¶61, 62.*** On or around November 18, 2019, Margaret Griffith informed Mr.
Robinson of his administrative leave without providing a reason. ***Amend. Compl. ¶64.***

On or around November 23, 2019, Mr. Robinson spoke with an investigator from Human
Resources, Pete Luedemann, who did not disclose the reason for the investigation. During the

conversation, Mr. Robinson mentioned reporting Agee's discrimination, believed he was being retaliated against, highlighted his positive performance as acting DM, and expressed concerns about discrimination based on his race (African American). He also noted the lack of diversity among the DMs, with six out of seven being Caucasian and one Latino. Less than six weeks after raising these concerns with Luedemann, Mr. Robinson was terminated. *Amend. Compl. ¶65.*

Ultimately, Mr. Robinson was informed that an employee under his management at the Jennifer Road Branch had accused him of pushing him. However, the allegations were entirely false, and Mr. Robinson was never counseled or informed about any such accusation. *Amend. Compl. ¶66.* Mr. Robinson was informed that he violated the WF antiharassment policy, although he had never received written documentation or warnings about this violation. *Amend. Compl. ¶¶67,68.* Mr. Robinson remained on administrative leave from November 18 until December 30, 2019, when Margaret Griffith informed him of his termination for cause. *Amend. Compl. ¶69.*  The termination occurred less than six weeks after Mr. Robinson raised concerns about WF's discriminatory practices, retaliation for reporting discrimination, and discrimination based on his race (African American). Griffith expressed sadness but provided no information or reasons for the termination. *Amend. Compl. ¶69.* Contrary to the WF Personnel Handbook, Mr. Robinson was not given the opportunity to challenge or discuss the investigation's findings with WF management. He was also excluded from participating in the investigation. *Amend. Compl. ¶70.* All investigators and decision-makers involved in Mr. Robinson's termination were Caucasian. *Amend. Compl. ¶71.*  Until his termination, Mr. Robinson had a spotless record with no prior disciplinary issues whatsoever.

## STANDARD OF REVIEW

Defendants have a high burden to overcome with respect to a Rule 12(b)(6) motion to dismiss. This Court is required to accept Plaintiff's factual allegations as true and construe those factual

allegations in a light most favorable to the Plaintiff. *Tucker v. Chrysler Credit Corp.,* No. 97-1364, 1998 WL 276266, at *2 (4th Cir. May 29, 1998) (citing *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 217-18 (4th Cir. 1994)). Furthermore, the Court "must disregard the contrary allegations of the opposing party." *Gillespie v. Dimension Health Corp.,* 369 F. Supp. 2d 636, 640 (D. Md. 2005).

The standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a claim was laid out by the United States Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (May 18, 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Facial plausibility" exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard requires more than a "sheer possibility that a defendant has acted unlawfully." *Id.* To satisfy the minimal requirements of the rule, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (brackets in original) (internal quotation marks omitted).

Thus, to prevail on their motion, Defendants must prove that Plaintiff's Complaint does not allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1940 (citing *Twombly,* 550 U.S. at 556). In order to maintain the Motion as a Motion to Dismiss, Defendants must prove these elements without presenting evidence extrinsic to the Plaintiff's Complaint. Fed. R. Civ. P. 12(d).

If the Defendants present, and this Court accepts, extrinsic evidence, the Motion to Dismiss for failure to state a claim must be converted to a Motion for Summary Judgment and the Plaintiffs must

be given proper notice and reasonable opportunity for discovery. Fed. R. Civ. P. 12(d). In a Motion to

Dismiss, a court may "consider a document submitted by the movant that was not attached to or

expressly incorporated in a complaint, so long as the document was integral to the complaint and *there*

*is no dispute about the document's authenticity*." *Gaines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159,

165-66 (4th Cir. 2016) (emphasis added).

## **APPLICABLE LAW**

The Civil Rights Act of 1964 (Title VII), 42 USCS § 2000e-2, outlaws the following employer

practices:

(a)  Employer practices. It shall be an unlawful employment practice for an employer-
-
   (1)  … <u>to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race</u> …; or
   (2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or <u>otherwise adversely affect his status as an employee, because of such individual's race</u> … .

42 USCS § 2000e-2. (Emphasis added.)

Under 42 USCS § 2000e-2 (k)(1)(A)B, "[a]n unlawful employment practice based on disparate impact is established under this title only if--
   (i)  a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race … and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; ...
   (B)  (i)  With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a <u>respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.</u>

*Id.*

The elements for race discrimination under the pretext framework under Title VII, are (1)

membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and

(4) that similarly-situated employees outside the protected class were treated more favorably. *White v. BFI Waste Services*, LLC, 377 F.3d 288, 295 (4th Cir. 2004). Upon establishing a *prima facie* case, the burden shifts to the Defendant to prove a non-discriminatory reason for the action. *Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 285 (4th Cir. 2004). The burden then shifts to the employee to demonstrate that the employer's stated reasons were a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). Plaintiff must (1) present direct or compelling circumstantial evidence that discrimination motivated the employment decision at issue, or (2) raise an inference of discrimination through the two-step "pretext" framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 285 (4th Cir. 2004).

In his complaint, Mr. Robinson has alleged illegal failure to promote, illegal termination and that the Defendant engaged in retaliatory behavior in violation of §1981. Section 1981 provides that: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *Hodge v. Walrus Oyster Ale House*, Civil Action No. TDC-18-3845, 2019 U.S. Dist. LEXIS 198763, at *17 (D. Md. Nov. 15, 2019).

The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* *17. To state a claim under Section 1981, a plaintiff must establish "purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b)." *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999);

*Hodge v. Walrus Oyster Ale House*, Civil Action No. TDC-18-3845, 2019 U.S. Dist. LEXIS 198763 (D. Md. Nov. 15, 2019). The substantive elements of a *prima facie* case of employment discrimination under Section 1981 are the same as for a claim brought under Title VII. *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002); *Sewell v. Strayer Univ.*, 956 F. Supp. 2d 658, 673 (D. Md. 2013).

In order to establish a *prima facie* case of discrimination based on a failure to promote, a Plaintiff must show that: (1) He is a member of a protected class; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected [*18] for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Although it is not strictly necessary for a plaintiff to establish all elements of a *prima facie* case in the complaint, a plaintiff must allege sufficient facts to support a plausible inference of discrimination and thereby raise a right to relief above the speculative level. *See Swierkiewicz v. Sorema NA.*, 534 U.S. 506, 510-11, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). *Hodge v. Walrus Oyster Ale House*, Civil Action No. TDC-18-3845, 2019 U.S. Dist. LEXIS 198763, at *16-18 (D. Md. Nov. 15, 2019)

## ARGUMENT

### I.    Robinson's States a Claim for Discriminatory Termination Under Section 1981 and Title VII and Discriminatory Failure-To-Promote Under Section 1981

#### A.   Failure-to-Promote

Plaintiff alleges in his complaint that Wells Fargo engaged in a pattern and practice of promoting white employees over African American employees for District Manager positions.

The Supreme Court has held that a plaintiff alleging a pattern and practice of discrimination must establish by a preponderance of the evidence that racial discrimination was the defendant's standard operating procedure. *See Int'l Broth. of Teamsters* v. *United States*, 431 U.S. 324, 336, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). In the instant case, Plaintiff has forecast evidence of a pattern and practice of differential treatment affecting other members of his protected class.

The statistical evidence pled demonstrates that at the time Plaintiff was applying for the District Manger position, there were six existing positions but only one was held by a non-white male. To establish that Wells Fargo had a standard operating procedure of discrimination, Plaintiff is required not to merely allege that this is a pattern or practice case, but to offer statistical evidence and anecdotal testimony to demonstrate that widespread discrimination exists, which he has done. Thus, to the extent that Plaintiff is claiming that Wells Fargo engaged in a pattern and practice of discrimination, Wells Fargo's motion to dismiss should be denied. *Janey v. N. Hess Sons, Inc.*, 268 F. Supp. 2d 616, 626 (D. Md. 2003)

In the claims of discriminatory failure-to-promote under Title VII and Section 1981, Plaintiff, in detail, outlines how he was passed over multiple times for a District Manager position, each time such position being awarded to a Caucasian.  Ultimately, the DM position at issue --for the Prince George's County District-- was again awarded to an individual –a Latino woman-- outside of Plaintiff's protected class.

The issue of hiring outside of the protected class as evidence of racial bias was addressed in *Hodges v. Walrus Oyster House,* 2019 U.S. Dist. LEXIS 198763, 20-21.  Pleading a "'fact-based nexus between Defendants' decision to hire individuals other than her for the position in question and Defendants' purported bias against Plaintiff's race' … is satisfied by an allegation that the person who was actually promoted was not a member of the protected class to which plaintiff

14

belongs." *Id. quoting Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F. 3rd 1126, 1129-30 (4th Cir. 1995). "Hodge is an African American, while all of those she claims were discriminatorily promoted are not. Hodge has therefore satisfied this requirement and, more broadly, all of the elements of a prima facie case of a discriminatory failure-to-promote claim under Section 1981." *Id.*

In the case *sub judice*, Plaintiff detailed a pattern and practice of his not getting promoted to Caucasian, less qualified applicants. And, ultimately, he was passed over for the Prince George's County DM position to a Latino woman who again is outside Plaintiff's protected class of African American and hired in his place.

Plaintiff also pled that he was treated disparately to his white counterparts. Indeed, as noted by Defendant, whereas two DM positions were promised or "earmarked" for Caucasian applicants (e.g., Ray Schreiner, *see* Defendant's Motion to Dismiss p. 12; and DM position already promised to Margaret Griffith, *see* Defendant's Motion to Dismiss, p. 13), Plaintiff pled that in exchange for not applying for those positions, he was promised the Prince George's County DM position. Yet, in contrast to Schreiner and Griffith, two Caucasians who were promised and awarded DM positions, the promise to Plaintiff was not honored and he did not receive a DM position.

Additionally, while DM positions were "earmarked" and "promised" to Caucasian employees such as Schreiner and Griffith, Plaintiff was subjected to a "new … very extensive process" that contained "two levels of screening (prior to the interview, and post-interview) and that her team looked at a variety of factors over many years of service." ***Amend. Compl. 42.*** In contrast, Plaintiff's white counterparts received DM positions that were "promised" and earmarked" for them.[2]

---

[2] To the extent that the Court believes that the disparate treatment is not sufficiently pled regarding the violation of Title VII and Section 1981, Plaintiff moves for leave to amend.

Plaintiff also pled specific examples of racial prejudice and bias of key Wells Fargo employees who were involved in the hiring process.  Indeed, Plaintiff pled that just prior to his application for the District Manager position, Ray Schreiner, Mr. Robinson's direct manager made racially discriminatory statements such as plaintiff would be promoted because "You're the safe Black Guy." *F.A.C ¶35*  Schreiner also made statements such as Plaintiff would be one of the first African Americans promoted to Branch Manager since he "speaks English properly," "you don't use vernacular" and that "you know how most Black people are; you're not that way. *F.A.C ¶35.* Schreiner's discriminatory words exemplify the Defendant's underlying racial animus in not promoting African Americans to management positions, including DM positions.

At the time Plaintiff was not promoted, five of the six DMs in Maryland were Caucasian, and one was Latino. *F.A.C ¶36.*  Plaintiff pled that Ray Schreiner was good friends and had a lot of influence with Patty Tuttle, one of the members of the panel that decided not to award Plaintiff the Prince George's County DM position, despite promises that he would be awarded that position if he did not apply to and compete with Margaret Griffith for the South-Central DM position. *F.A.C ¶27.*

As to the third element, Plaintiff has sufficiently plead facts that allege he was meeting legitimate employment expectations. Plaintiff was eminently qualified for the DM position and had applied around April 2019 for the DM position for the Greater Prince George's market in the Maryland Region. *F.A.C ¶39.* Indeed, Plaintiff had been serving as the interim District Manager since late October of 2018 for that same market. *F.A.C ¶30.* Plaintiff accepted the interim position and had bene promised the position on a permanent basis in exchange for not applying for and competing with Margaret Griffin for the South-Central DM position. *F.A.C ¶30.* In this role, Plaintiff did not receive any pay increase and was working 60-80 hours a week managing both the Jennifer Road Branch and taking on the additional role of serving as the active District Manager. *F.A.C ¶30.*

16

In further inferential support of the alleged fact that Plaintiff was meeting legitimate employment expectations, Plaintiff's District Manager Ray Schreiner placed Plaintiff on multiple stretch assignments, Plaintiff was asked to coach peers who were struggling, onboard new platform team members and managers, co-facilitate portions of Branch Manager meetings and lead a specific market segment for the South-Central Market. *F.A.C ¶31.* Plaintiff's performance of these assigned duties led to the Plaintiff being assigned the role of Peer coach and influencer. *F.A.C ¶32.* Plaintiff was the only Branch manager with the track record to support moving him to take on the stretch assignment of managing the nine branches of the Greater Prince George's market, arguably Maryland's most challenging market, along with his own*. F.A.C ¶32.* As to the fourth element, the first amended complaint has sufficiently pled facts that allege Plaintiff was treated differently from "similarly situated" persons outside of his protected class.

A plaintiff alleging a discriminatory failure to promote based on race under Title VII or § 1981 under the McDonnell Douglas framework must establish his prima facie case by showing: "(1) []he is a member of a protected group, (2) there was a specific position for which []he applied, (3) []he was qualified for that position, and (4) [defendant] rejected [][his] application under circumstances that give rise to an inference of discrimination." Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004); see id at 430 n.5 ("The same elements are required for failure-to-promote claims alleged under Title VII and § 1981. . . .") Roane v. United Airlines, Inc., Civil Action No. 1:16-cv-1004 (AJT/TCB), 2017 U.S. Dist. LEXIS 222003, at *13 (E.D. Va. Oct. 12, 2017).

Here, the Plaintiff has pled facts sufficient to support *prima facie* showing of a failure to promote under §1981. Plaintiff is an African American Male, therefore a member of a protected class. *F.A.C ¶ 83.* The specific position that Plaintiff applied for in April of 2019 and was qualified

for was the District Manager position for the Greater Prince George's market in the Maryland region. *F.A.C ¶30*

At the time Plaintiff was not promoted as is explained more fully, infra, five of the six WF DMs in Maryland were Caucasian, and one was Latino. *F.A.C ¶36* In early March 2019, the Prince George's DM position became available, and Robinson applied, interviewed, and was moved forward in the process. *F.A.C ¶37.*

He was told on or around April 3, 2019, however, that he was not selected to move forward and offered the position, even though Patty Tuttle, the area president, had advised him that he was the high scorer in the interviewing process and informally had congratulated him on getting the position. *F.A.C ¶38* No reasons were given, but Plaintiff's Regional President, Patty Tuttle explained that it allegedly had something to do with Plaintiff's coaching or communication style, but she was not sure. *F.A.C ¶39*

The discriminatory circumstances are further compounded by the Plaintiff's suspicious interactions with Employee Relations. Tuttle further stated that a representative from Employee Relations (ERC) would be reaching out to Plaintiff to go over the specifics at a later date, but going forward, Plaintiff would be expected to return to the branch and conduct his normal job functions. *F.A.C ¶40.* That same day, Plaintiff contacted ERC stating that he needed urgent assistance and clarification on what exactly was the issue that prevented him from getting the position since the inference was that his communication and/or management style was flawed, and he was to return to his Branch Manager position, which was still a leadership and management position. *F.A.C ¶41.* Additionally, up to that point, Plaintiff had never been formally coached on any of these issues, nor had Plaintiff in any way been criticized regarding his management style or technique. *F.A.C ¶41.*

On or around April 5, 2019, Robinson received a call from Ellen Marriott, a Caucasian female, who introduced herself as the Senior ERC Manager for the specific division that handled the screening process for District Manager and above job positions. *F.A.C ¶42.* She stated that the screening process that Plaintiff went through was allegedly a new process that is very extensive. She went on to explain that there are 2 levels of screening (prior to the interview, and post-interview) and that her team looked at a variety of factors over many years of service such as (but not limited to) leadership style, historical sales practice record, and team members who have been terminated or put on corrective action under Plaintiff's leadership.  No Caucasion applicants were sujected to this more rigorous standard, but rather received positions that were "promised" to or "earmarked" for them. *F.A.C ¶42.* Prior to this phone call, Plaintiff had never received any negative feedback on his management style or performance, only the warning from Schreiner not to report the discriminatory treatment of Agee because it would adversely impact his chances at promotion to the DM position. *F.A.C ¶42.*

Yet, *suddenly*, according to Mrs. Marriott, there allegedly was an ERC case that was placed in late September/October 2018, that had never been brought to Plaintiff's attention, on which Plaintiff had never been counseled, but that raised and suddenly took issue with Plaintiff's coaching style. *F.A.C ¶43.* And, based on that case (and that case alone) there suddenly appeared and was allegedly an issue where, as a consequence, WF decided not to move Plaintiff forward. *F.A.C ¶43.* From that case, suddenly Plaintiff was found –for the very first time-- to have challenges with his ability to communicate with his team. *F.A.C ¶43.* Notably, Plaintiff reported the discrimination and made Schreiner aware of his reporting it after the bogus ERC case that allegedly had occurred six months prior to his engaging in protected activity and that had never been brought to Plaintiff's attention until after engaging in protected activity. *F.A.C ¶43.*        The case from late

September/October 2018 involved a team member –a teller— that did not report directly to Plaintiff but complained that Plaintiff was absent from the branch and did not advise the team why he was absent. Of course, during this time, Plaintiff had been charged by his District Manager to act as a District Manager which necessitated time away from the branch. Yet, that Plaintiff was away from the branch –when he was engaged to do a job that required it—was now being cited as a flaw in his management style. *F.A.C ¶44.*

Indeed, at all times that Plaintiff was absent from the branch, he let the most senior person at the branch know where he was, what he was doing, and how to get in touch with him. *F.A.C ¶44.* And, until he applied for the District Manager position more than six months later, Plaintiff had never been advised or counseled that there were any issues with his management style or practice. *F.A.C ¶44.* The ERC representative further alleged that Plaintiff had inappropriately counseled people in public, yet until Plaintiff had applied for the District Manager position, Plaintiff had never been alerted or counseled that there were any flaws with his management style or that he needed improvement in any areas whatsoever. *F.A.C ¶45.*

No examples of inappropriate counseling were given to Plaintiff, nor did Marriott discuss or differentiate instances when Plaintiff should coach an employee in public, such as when an employee was having a problem handling a customer issue and needed immediate assistance in the moment. *F.A.C ¶46.* Plaintiff was not afforded the opportunity to even respond to the criticisms Marriott was raising for the very first time, nor was he in any way counseled on how he should improve. Rather, Marriott said the decision not to move him forward was final without providing Plaintiff an opportunity to respond. *F.A.C ¶47.*

Marriott's suggestion on improvement was simply "to do a better job of communicating" and "not to coach others in public" without being specific and without addressing certain instances that

warranted coaching in public, such as assisting an employee in the moment on how to handle a customer issue that the employee did not know how to do. *F.A.C ¶48.* Plaintiff assured Marriott that any counseling or coaching of a sensitive nature always took place in private, yet Marriott would not listen. *F.A.C ¶49.* Plaintiff explained how he alerted senior employees to his whereabouts and what he was doing when he was out of the branch and invited Marriott to review the emails and other correspondence that provided confirmation, but Marriott would not listen or agree to review the documentation. *F.A.C ¶50.* Marriott did not explain why she took the word of the branch employee, Kimberly Lind, a white female, and never bothered to interview Plaintiff as part of her investigation. *F.A.C ¶51.*

By the time Plaintiff was contacted by Marriott, he had been performing the District Manager job for five months as a stretch assignment. *F.A.C ¶52.* Significantly, Plaintiff's performance as the District Manager was not formally reviewed; rather, his lack of presence at his branch, even though he was required to be away from the branch—was used as a pretext to deny him the promotion to District Manager. *F.A.C ¶52.*

Plaintiff's District Manager gave him the autonomy to run the District and, even though he was performing as the District Manager, Plaintiff ran double-duty and made sure that his branch was properly running. *F.A.C ¶53.* During Plaintiff's entire 5-month tenure as the acting District Manager, he received nothing but accolades and praise. And, during the entire time Plaintiff worked with his District Manager, Plaintiff was never placed on corrective action or had any documented coaching. *F.A.C ¶54.*

As a manager, Plaintiff was never placed on performance coaching or corrective action. *F.A.C ¶55.* Despite that Plaintiff was expected to return to work as a Branch Manager which, in and of itself, is a management position. *F.A.C ¶55.* And, even though Plaintiff, for the first time, was

being criticized, he still was not counseled on how to improve. *F.A.C ¶55.* Indeed, *if* the findings against Plaintiff's management style were *actually negative* and not a pretext to deny him the District Manager position begs the question *why* Plaintiff was being returned to a management position without coaching and the performance of which was now being criticized. *F.A.C ¶56.* Plaintiff requested guidance on how he could improve, but neither Marriott or anyone else from WF responded, and Plaintiff returned to his Branch Manager position. *F.A.C ¶57.* In the instant case, it is clear that Plaintiff has pled facts sufficient to make a *prima facie* case showing the elements of a failure to promote claim under §1981.

As is clear, Plaintiff has pled with specificity a *prima facie* case for failure-to-promote under Section 1981.

### B.  Termination

#### a.  Robinson States a Claim under Title VII and Section 1981 for Discriminatory Termination.

In the employment context, courts employ a common analysis on claims of racial discrimination brought under either Title VII or § 1981. *Gairola v. Va. Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).  In order to survive a motion to dismiss, a complaint for discriminatory termination under either statute must allege facts allowing for a reasonable inference that the defendant terminated the plaintiff's employment because of his race. *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). One might reasonably infer that an employee was terminated because of his race if the employee alleges direct or indirect evidence of a discriminatory motive or if he pleads a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green. See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978). An employee states a prima facie case of employment

discrimination when he claims (1) that he is a member of a protected class, (2) that his employer took an adverse employment action against him, (3) that he was meeting legitimate employment expectations, and (4) that he was treated differently from similarly-situated persons outside of his protected class. *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 527 (D. Md. 2015), *aff'd as modified*, 659 F. App'x 744 (4th Cir. 2016).

At the pleading stage, it is not *necessary* that a plaintiff plead the elements of a prima facie case of employment discrimination in order to survive a motion to dismiss. *McCleary-Evans*, 780 F.3d at 584-85. The plaintiff could, after all, allege direct evidence of an employer's discriminatory intent. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Nonetheless, because it raises a permissible inference of discrimination, pleading a prima facie case is *sufficient* to defeat a motion to dismiss. *Felder v. Maximus, Inc.*, No. JKB-16-3517, 2017 U.S. Dist. LEXIS 32779, at *4-5 (D. Md. Mar. 7, 2017)

Defendant does not contest the first three elements under the *McDonnell Douglas* test, and only challenges that Plaintiff does not aver that he was treated differently from similarly-situated persons outside his protected class. At this juncture, Plaintiff does not know the identity of the person who replaced him as Branch Manager, or the identities of other employees who were accused of wrongdoing, but not allowed to participate in the investigation.  Plaintiff thus moves the Court to allow discovery such that Plaintiff can secure the identity of the person who replaced him.

Plaintiff, however, has pled with specificity the discriminatory circumstances under which he was not promoted, including Ray Schreiner's discriminatory comments of Plaintiff as a "safe black guy" who Wells Fargo should go against their usual and customary practices and promote.  Only a few months later, Plaintiff was placed on leave and then fired under circumstances that had not changed since his not being promoted in April of 2019.  Thus, the same circumstances that gave rise

23

to the discriminatory failure to promote can equally be attributed to his termination, which Plaintiff

claims was based on a baseless, pretextual charge lodged by a Caucasian female that was not allowed

to address and give rise to an inference of discriminatory motive under Title VII and Section 1981..


The Defendant mistakenly claims that Plaintiff has not alleged any facts that support an

inference of race discrimination in connection with his placement on administrative leave and

subsequent termination. In *Bing v. Brivo Sys., LLC, 959 F.3d 605, 611 (4th Cir. 2020)*; *McCleary-*

*Evans*, 780 F.3d at 586 (describing "the allegation that non-Black decisionmakers hired non-Black

applicants instead of the plaintiff [as] consistent with discrimination" but "not alone support[ing] a

reasonable inference that the decisionmakers were motivated by bias")  the court held that mere fact

that the decision makers were of a different race than Plaintiff, does not create the plausible inference

of race discrimination. The instant case before the Court is unlike *Bing*, where the Plaintiff merely

alleged that (1) the Defendant did not know he was Black until seeing him at orientation, and (2)

That the defendant conducted a google search on the plaintiff within their first few hours of

employment.

## <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion to Dismiss must be denied.

Respectfully submitted,


_____/S/_____
Michael E. Glass, MBA, Esq.
Trial Bar No. 11805
The Michael Glass Law Firm
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
Phone: (410) 779-0600, Fax: 410-799-2391
Email: mglass@mglasslaw.com

24

*Attorney for Plaintiff Randall Robinson*

**REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing on this matter.

_____/S/_____
Michael Glass, Esquire

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this May 30, 2023, a copy of the foregoing was served via electronic court filing on all counsel of record.

_____/S/_____.
Michael Glass, MBA, Esq.

26

27